## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Jason Kuyper**, a California citizen, | : | Civil Action No. |
| **Bruce Kuyper**, a California citizen | : | |
| **Reena Kuyper**, a District of Columbia citizen, | : | |
| | : | |
| v. | : | |
| | : | |
| **The Hill School**, a Pennsylvania nonprofit | : | JURY TRIAL DEMANDED |
| corporation; and | : | |
| **Zachary G. Lehman**, a Pennsylvania citizen; | : | |
| **David Allain**, a Pennsylvania citizen; | : | |
| **Heidi Eccleston**, a Pennsylvania citizen; | : | |
| **Sandra Ryder**, a Pennsylvania citizen; | : | |
| **Nathaniel Yinger**, a Pennsylvania citizen; and | : | |
| **Jennifer Bethke Maccarella**, a Pennsylvania | : | |
| citizen. | : | |

## COMPLAINT

### Parties

1.     Plaintiff Jason Kuyper is a citizen of the State of California, with a residence address of 11805 Bellagio Road, Los Angeles, California 90049-2116.

2.     Plaintiff Bruce Kuyper is a citizen of the State of California, with a residence address of 11805 Bellagio Road, Los Angeles, California 90049-2116. Bruce Kuyper is Jason Kuyper's father.

3.     Plaintiff Reena Kuyper is a citizen of the District of Colombia, with a residence address of 2140 Wisconsin Ave NW, Unit 4, Washington, DC 20007. Reena Kuyper is Jason Kuyper's mother.

4.     Defendant The Hill School is a nonprofit corporation that is incorporated under the laws of the Commonwealth of Pennsylvania with a principal place of business at 717 East High Street, Pottstown, Pennsylvania 19464-5791.

5.     Defendant Zachary Lehman is the Headmaster of The Hill School and is a citizen of the Commonwealth of Pennsylvania, with a residence address of 717 East High Street, Pottstown, Pennsylvania 19464-5791.

6.      Defendant David Allain was the Dean of Students of, and remains an employee of, The Hill School and is a citizen of the Commonwealth of Pennsylvania, with a residence address of 717 East High Street, Pottstown, Pennsylvania 19464-5791.

7.      Defendant Heidi Eccleston is the Associate Dean of Students of The Hill School and is a citizen of the Commonwealth of Pennsylvania, with a residence address of 717 East High Street, Pottstown, Pennsylvania 19464-5791.

8.      Defendant Sandra Ryder is the Health Center Administrative Director of The Hill School and is a citizen of the Commonwealth of Pennsylvania, with a business address of 717 East High Street, Pottstown, Pennsylvania 19464-5791.

9.      Defendant Nathaniel Yinger is the Assistant Director of Communications of The Hill School and is a citizen of the Commonwealth of Pennsylvania, with a residence address of 717 East High Street, Pottstown, Pennsylvania 19464-5791.

10.      Defendant Jennifer Bethke Maccarella, formerly known as and referred to herein as Jennifer Bethke, is the Associate Director of College Counseling of The Hill School and is a citizen of the Commonwealth of Pennsylvania, with a business address of 717 East High Street, Pottstown, Pennsylvania 19464-5791.

## Jurisdiction and Venue

11.      This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because all plaintiffs are citizens of states that are different from the state that all defendants are citizens of, and the matter in controversy exceeds the sum or value of $75,000.

12.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because all defendants are residents of the state and in which this district is located.

13.      Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the causes of action in this complaint occurred in this judicial district.

**Introductory and General Allegations Common to More Than One Count**

14.     Jason Kuyper first enrolled at The Hill School as a 14-year old freshman boarding student in September 2012. As with most children his age residing away from home, Jason had an adjustment period before adapting well to his new environment. Jason lived in a small dormitory house with 8 other freshmen overseen by two seniors (prefects) and a retired Naval Commander and alumnus of The Hill School as his dorm parent with his wife and four children of their own. Jason joined the soccer team, accelerating past the Freshmen squad to the JV team; also participated in basketball and track; and finished the school year with a GPA of 3.4, taking 6 classes.

15.     Jason Kuyper was reenrolled and returned to The Hill School for his sophomore year in September 2013.  However, "the family boarding school" experience vanished. He and his fellow sophomore roommate were placed on a dormitory floor occupied entirely by seniors and PGs (post-graduates, who are the age and maturity equivalent of college freshmen) who are afforded greater liberties and provided notably less structure, with a dormitory "parent" quite unlike the prior year – a bachelor in his mid-20's, only three years out of college, and indifferent to the hazing and bullying Jason suffered at the hands of his 18 and 19-year-old hallmates.

16.     During Jason Kuyper's sophomore year, his challenges, particularly as an adolescent suffering from Type I diabetes, was not due solely to his hallmates regular invasions of his room, stealing his essential glucose-enriched provisions for which his "dorm parent" had no concern, but also the discriminatory treatment Jason suffered under the new director of The Hill School's Health Center, Sandra Ryder.

17.     Under the orders of the new Health Center Director, Jason was obliged to adhere to excessive demands not required of any other student, and for which he received numerous demerits from Sandra Ryder, apparently without authority to do so, and to which no other student is ever subject, if Jason failed to meet those demands; all because Jason suffers from a health disability.

18.     Though the disparate treatment of Jason Kuyper for his medical condition did not cease, Jason Kuyper's father succeeded in having those prejudicial demerits removed from Jason's records only after much insistence and pointing their inappropriate and discriminatory nature.

19.     Despite the communication from Jason Kuyper's father putting an end to the discriminatory and prejudicial demerits, Jason continued to be burdened with demands from Sandra Ryder, not imposed on any other student.  Nonetheless and notwithstanding Sandra Ryder's suggestion of Jason's lack of responsibility and personal accountability. Jason maintained a 3.61 GPA while taking 6 classes, earned a Silver medal in the National Latin Examination, a Certificate of Merit in the National (Ancient) Greek Examination, while also earning a Varsity Letter in Soccer and a JV letter in basketball.

20.     Due to Sandra Ryder's relentless harassment of Jason Kuyper during his sophomore year, and her constant reminder of his medical condition and the consequent psychological damage of being earmarked as disabled, his parents determined it was best he not return to The Hill School as a boarder, but rather as a Day Student. As Day Student, Jason would only be subject to Sandra Ryder's unreasonable control during school hours.

21.     In April 2014, Jason Kuyper's mother, Reena Kuyper, timely advised The Hill School that Jason would be reenrolling as a Day Student in September. However, Thomas Eccleston, the Assistant Headmaster for Enrollment Management, only agreed to accept Jason's reenrollment if full boarding fees were paid, despite Jason being a Day Student, alleging his changed status would disrupt the "tuition revenue model" (of a school with an endowment of some $140 million).

22.     As April was too late to enroll Jason in another comparable private school for the next academic year and the Kuypers did not want to risk the appearance on Jason's transcript of a mid-high school change to a public school, often associated with a disciplinary dismissal, the Kuyper's succumbed to The Hill School's extortion.

23.     Free of many of the unnecessary, discriminatory restraints of Sandra Ryder, Jason Kuyper thrived in the Fall of his Junior year as a Day Student, finishing the Second List (latter half) of the Fall term with a GPA of 3.58, MAPL All-League and All-Bucks/Montgomery Counties Honorable Mentions and the Soccer team co-captainship for the next season, after helping guide the team to a State Championship victory.

24.     In the Winter, the 1.5-hour commute to school (each way) grew longer with the worsening weather and started taking its toll on Jason's schoolwork, as well as on his mother, who resided near Princeton, New Jersey, 70 miles away, and whose work required her to travel, further complicating a daily round trip commute of upwards of four hours, depending upon the weather. Consequently, at the start of 2015, Jason moved into the dormitory as a boarder for the remainder of the school year, inasmuch Thomas Eccleston required the Kuypers to pay the higher full boarding fee for the year anyway.

25.     Jason Kuyper completed his Junior year with two Varsity Letters, a Certificate of High Honor in the National (Ancient) Greek Exam, SAT scores in the 86th percentile (Critical reading), 91st percentile (Writing) and 95th percentile (Mathematics), and a GPA of 3.46, reenrolling for his Senior year as a boarder, to share a room with his fellow Soccer captain.

26.     Jason Kuyper completed the Fall term of his Senior year with a 3.66 GPA, and the determination to develop himself as a stronger soccer player and more recruitable college applicant by attending another boarding school the following year as a PG (post graduate, typically enrolled for athletic development purposes).

**A Female Classmate Sexually Assaults Jason**

27.     Jason Kuyper's future academic plans had a tragic, near-derailment, when at a New Year's Eve party a few miles from The Hill School, he was sexually assaulted while under the influence of alcohol that had been provided, along with some drugs, to the minors at the party, all fellow students from The Hill School.

28.     Jason may have been surreptitiously administered Rohypnol by his assailant, the hostess of the party, who purportedly had been dismissed from her prior boarding school for

sexual misconduct, though the actual reasons for her dismissal and transfer to The Hill School are unknown to Plaintiffs.

29.     It is known that Jason Kuyper's assailant had aggressively pursued other students and made her interest in Jason clear, despite his insistence of wanting no more than a friendship. It is also known that she served alcohol and drugs to her guests that New Year's Eve, mostly all minors like herself.

30.     Early the next morning, still at the classmate's home and party, Jason Kuyper awoke by a windowsill with no recollection of anything that transpired since late the prior evening. All that he knew was that he was unusually tired. In the kitchen, Jason overheard the hostess "bragging" that she had had sex with him. She knew that Jason had no interest in intercourse with her nor in losing his virginity to her or anyone at that time. It was at this point, Jason started to realize that she had intercourse with him without his consent and believed he had been drugged by her.

31.     When The Hill School's classes resumed several days later, in January 2016, many of Jason Kuyper's fellow students and peers knew what had happened to him, apparently better than Jason himself. He was too ashamed to discuss the matter with anyone, including his family and closest friends, until a social sexuality educator came to speak at The Hill School a couple of weeks later. After her presentation, Jason spoke with her about the incident and she insisted he discuss it with The Hill School's counselor.

32.     Jason Kuyper shared, as best as he could recall, what had transpired at the New Year's Eve party with his school counselor, Rebecca Smith. He also revealed his depression and crying alone in his dormitory room when classmates teased him about the incident.

33.     Several days later, Jennifer Lagor, the Assistant Headmaster of Student Life, approached Jason Kuyper about the matter. She asked Jason to make a formal statement which she transcribed. That statement included Jason Kuyper's use of controlled substances at the New Year's Eve Party.

34.     Jennifer Lagor encouraged Jason Kuyper to take a short leave of absence from The Hill School, and contacted Jason's parents, advising them their son had been sexually assaulted, information The Hill School had known for nearly a full week prior to apprising for the first time the parents of the minor victim.

35.     Jason Kuyper returned to campus after four days and discovered that the classmate who had sexually assaulted him was no longer on campus. On information and belief, The Hill School gave her a medical leave, and permitted her to complete her senior year remotely and earn in May of that year, 2016, a certificate of completion or her diploma from The Hill School.

36.     Aware that at this point that the entire school knew of his having been sexually assaulted by a female classmate, Jason Kuyper struggled with his shame while endeavoring to complete his academic course.

37.     After Jason Kuyper's return to the campus following the four-day leave, there was no true effort to ensure Jason's mental and emotional well-being by his counselor, academic advisor or any of the deans, let alone the headmaster.

38.     Furthermore, no concern taken with Jason Kuyper or apparently anyone else at the New Year's Eve party known or believed to have consumed the controlled substances provided to them. Jason Kuyper and presumably none of the other students known or believed by The Hill School to have consumed alcohol as well as other controlled substances were suggested to seek counseling or enter into the I Care system.

39.     All that The Hill School is known to have done after learning of a party near campus where alcohol and other controlled substances were consumed by minors, was call a meeting during Jason's four-day leave, with all who attended the New Year's Eve party, at which they were blamed by the headmaster, Zachary Lehman, for what had taken place, but no known supportive action or assistance was provided to anyone, especially Jason.

### Adult Responsibility Passed To Minors

40.     The Hill School has a program referred to as I Care (Immediate Care) that replaced an earlier program referred to as FIT (Faculty Intervention Team), both created to address substance use by students.

41.     I Care was purportedly created "[w]ith the ultimate priority of students' physical well-being in mind" and provides for "students to get help for themselves or other students"; it "allows students to care for each other by seeking the assistance of an adult in dangerous situations." But it "[m]ust be student initiated. Adolescents must help themselves or one another; adults will not step in. The onus is on the child; I Care seemingly liberates The Hill School faculty of its *in loco parentis* duty relative to a child's possible use of controlled substances. *See* Exhibit A at 42.

42.     FIT (Faculty Intervention Team), which had been in place at the time of Jason Kuyper's application to attend The Hill School and throughout his first two years at the school, was the "result of concern for the welfare of the student body" thus "was formed to address issues of adolescent substance use."

43.     FIT's mission was to "respond, through intervention and support, to referrals by members of The Hill School community regarding potential substance use," and to "operate in the best interest of the student" since "The Hill School, in good faith, [had] developed this non-disciplinary option for a student's well-being." To this end, in support of the students, FIT enlisted the support of "teachers, coaches, dorm parents, table heads, and advisers."

44.     In Jason Kuyper's junior year, I Care was added to The Hill School Handbook thus incorporated into the contract between the school and its students and their parents, and the Faculty Intervention Team was eliminated, along with the commitment that "[t]he school will attempt to notify parents before a substance test is administered", without reasonable forewarning to the students and their parents of the change from an adult *in loco parentis* responsibility relative to substance use to one of laissez-faire, and relative to drug testing, one of shared parental concern to that of a police state.

45.     I Care (Immediate Care) provided for an immediate, discipline-free solution for a student about to be discovered having used a controlled substance to "bring him/herself or another student under the influence of a substance … to any adult in the community without fear of a disciplinary response." As written in The Hill School Handbook, it appeared to be a program designed to enable students to avoid disciplinary sanctions for substance and seemingly for The Hill School faculty to avoid proactive responsibility for substance use by the adolescents in its charge.

### The Hill School's Summary Dismissal of Jason Kuyper

46.     On the afternoon of Sunday, February 14, Valentine's Day, Jason Kuyper, in a depressed state due to the occurrences of the prior weeks, agreed to accompany two classmates outside what they knew to be their dormitory, with the intent to attempt to consume marijuana.

47.     Jason Kuyper nor seemingly either of the other two students had any marijuana, and their only means to consume marijuana, had they any, was a vaporizer hidden in a utility closet by another student.

48.     Jason Kuyper and the other two students proceeded to the classroom hallway located on the ground level of Wendell Hall, the edifice of which the top three floors contained student and faculty housing and the bottom, ground level classrooms, to determine whether the borrowed vaporizer contained any remnants of marijuana, since if it did not, the invitation to Jason would be moot.

49.     A dorm parent, Nate Yinger, passing through the classroom hallway while taking out his trash, stumbled upon the three boys when he allegedly noticed one of the three entering a closet at the end of the hallway, where the other two were in the process of opening the vaporizer to determine its content.

50.     Almost immediately following Nate Yinger opening the door of the closet where the three boys convened, one of the three, who had been closest to the door spraying air freshener to mask the potential odor that might emanate from the opened vaporizer, requested I Care of Nate Yinger, on behalf of himself, Jason Kuyper and the third boy, utilizing this fairly

new system as it was intended, since all three had not yet committed a violation, and were engaged in "risky behavior" placing themselves in a "dangerous situation" thereby "endanger[ing] … their Hill School careers", all elements of I Care.

51.     Jason Kuyper and one other boy departed while the third remained to speak further with Nate Yinger, after which Nate Yinger directed that student to request the other two return to the classroom hallway while he called the dean on duty, Associate Dean of Students Heidi Eccleston, to advise her of the I Care request.

52.     As requested, Jason Kuyper and the other two boys returned to the classroom, where they waited for Nate Yinger and Heidi Eccleston. Nate Yinger waited for Heidi Eccleston just outside one of Wendell Hall's doorways.

53.     Rather than relate to Heidi Eccleston exactly what transpired and that led to the I Care request, Nate Yinger informed her of his impression of what happened, based on what the one boy shared with him subsequent to the I Care request and pursuant to its mandate that "the student in question must cooperate fully and be honest about their situation."

54.     Upon information and belief, the student who discussed his transgressions with Nate Yinger, had been smoking marijuana earlier that afternoon not in the company of Jason Kuyper nor presumably the other boy in the closet with them. He may have shared that he had been smoking marijuana (earlier) with the dorm parent.

55.     Upon entering the classroom hallway, Heidi Eccleston announced that the situation was not appropriate for I Care, seemingly based upon her misconception that Nate Yinger came upon Jason Kuyper and the other two boys with a vaporizer, using marijuana, and even saw smoke in the air.

56.     However, Nate Yinger never saw any of the three boys smoking marijuana, nor in possession of marijuana or any marijuana related paraphernalia, nor any smoke or vapor indicative of marijuana consumption.

57.     Further confirming Jason's belief he was being tested for I Care eligibility, Heidi Eccleston sought the cooperation of all three boys, conduct required only by I Care, informing

that otherwise the situation "would be a lot worse", requesting each retrieve all contraband from their respective dormitory rooms.

58.     Believing Heidi Eccleston was testing Jason's willingness to cooperate so as to be worthy of I Care, Jason Kuyper did everything asked of him, because "[i]f a student denies being under the influence or refuses to cooperate with the faculty member, they will be subject to discipline." Jason understood that "worse" warned by Heidi Eccleston to be discipline from which he would be shielded by I Care.

59.     Understanding that I Care is very much dependent on cooperation, Jason Kuyper gave Heidi Eccleston every possibly item of contraband from his room, despite none of the items actually being his property.

60.     When Jason Kuyper assured Heidi Eccleston that he turned over all the possible contraband that he was either aware of or able to locate, Heidi Eccleston indicated that she believed him, further giving Jason the assurance that he was in the I Care system because of his continued cooperation.

61.     Heidi Eccleston then escorted Jason to The Hill School's Health Center, where his cell phone was confiscated and he was directed to wait in one of the patient bedrooms, with the door closed.

62.     At some point Heidi Eccleston reappeared and gave Jason a piece of paper and pen to write a statement. Afterwards, a female nurse examined Jason and escorted him to a bathroom to obtain a urine sample for a urine drug screen.

63.     Despite being a minor and also knowing he had not consumed marijuana, Jason Kuyper agreed to provide a urine sample, especially since at The Hill School "[r]efusal to take a test will be treated as if the test results were positive." At the time Jason had no reason to know that even his negative drug test would be treated as positive.

64.     In his continued belief that his cooperation was being tested, Jason Kuyper stated to the nurse that he felt foggy from smoking marijuana despite the self-incrimination and the fact

that he had <u>not</u>, since under I Care, "[i]f a student denies being under the influence … they will be subject to discipline."

65.     Jason Kuyper was escorted back to the patient bedroom where he waited an unknown length of time before the Dean of Students, David Allain, appeared to inform Jason that he was dismissed from The Hill School, without discussion or posing a single question to Jason, and that they should call his parents. Until that moment, Jason thought that he had been in the I Care system, and was provided no explanation as to why that was not the case nor why he was being summarily dismissed.

66.     David Allain then escorted Jason Kuyper to another room from where he phoned Jason's mother and, in Jason's presence, informed her that Jason had been dismissed. David Allain then handed the phone to Jason and stepped out of the room, leaving the door open, presumably to eavesdrop on Jason's crying to his mother.

67.     After the phone call, Jason returned to the original room where he was being held, where he waited with the door closed for his mother to come pick him up. However, Headmaster Zachary Lehman appeared first.

68.     Despite having been immediately (albeit incorrectly) notified of the situation of three students having been taken to the Health Center for alleged drug use in a dormitory, Headmaster Lehman only attended to the matter much later, after completing his workout (in a building adjacent to the Health Center) and first returning home (across campus) to shower.

69.     Jason was lying on the bed when he heard the door open and turned to see Headmaster Lehman entering and then reclosing the door behind him. Headmaster Lehman, after repeating to Jason what Dean Allain had already stated an hour or so prior, that he had been dismissed from The Hill School, proceeded to interrogate Jason, particularly with regard to Jason's history of marijuana use.

70.     Jason Kuyper's attempt to explain to Headmaster Lehman that he did not have a history of marijuana use and that his experimental interest was very recent, subsequent to his recent traumatic experience (the sexual assault and ensuing bullying), was met with anger,

yelling, intimidation, and accusations of Jason lying because his confession "was too convenient."

71.     By the time Jason Kuyper's mother arrived Headmaster Lehman had already departed, having left Jason shattered, and he was unavailable to speak with Jason's mother. Only David Allain attended to Reena Kuyper, although he rebuffed her plea seeking more thoughtful consideration under the circumstances of Jason's recent sexual assault trauma only weeks prior, with a dismissive "life is not always fair."

### The Hill School's Complete Disregard for Truth

72.     Despite that Sunday, February 14, 2016, Jason Kuyper's mother having requested a meeting as soon as possible with Headmaster Lehman and having been assured a return call would be had, after no word for two days, on February 16, Reena Kuyper appeared at the headmaster's office seeking an audience. Headmaster Lehman rudely told her that he would not speak with her and she was sent away.

73.     Later that day, February 16, 2016, Headmaster Lehman scheduled a telephone call for the following day, Wednesday, February 17, with both of Jason Kuyper's parents.

74.     On Wednesday, February 17, Headmaster Lehman and David Allain spoke to both of Jason Kuyper's parents by phone. Headmaster Lehman insisted to Jason's parents that Jason had violated a school rule requiring his immediate dismissal (smoking marijuana in a dormitory) and as a consequence Jason's only option was to go to a local public school, and that The Hill School was required to disclose the details of Jason's dismissal to all prep schools and colleges to which Jason was applying.

75.     Headmaster Lehman's single alternative of a local public school for Jason Kuyper ignored what The Hill School well knew, that one of the reasons for Jason's boarding status was his parents residing on separate coasts, both with professional obligations involving travel.

76.     The Kuypers requested a copy of the written statement that Headmaster Lehman alleged contained Jason's confession of drug use in the dormitory, which Jason composed when he understood that he had the cooperation obligations of I Care and that he would not be

dismissed, and in which Jason did not confess as stated by Headmaster Lehman. (This the Kuypers would only learn a year later through formal discovery in a related lawsuit for breach of contract, since Headmaster Lehman never provided the statement to the Kuypers despite their requests.)

77.     The Kuypers also requested on behalf of Jason Kuyper, a minor at the time, a copy of Jason's drug test results, which they believed would exonerate Jason. That was first of many requests for those test results denied by Headmaster Lehman. Nearly a year and half has passed and not even formal document requests through the related breach of contract lawsuit has enabled the Kuypers to obtain that original drug test result.

78.     By way of formal discovery, over a year after the February 14, 2016 incident, the Kuypers discovered Sandra Ryder had intentionally discarded that original result, but they finally obtained a second drug test result from the urine specimen provided that day. The result revealed what Jason had every reason to know and Defendants very well knew since at least February 24, 2016, if not before – that Jason Kuyper's results were negative for marijuana or any other drug. *See* Exhibit B.

79.     On February 15, 2016, David Allain, sent a communication to the entire faculty justifying Jason Kuyper's wrongful summary dismissal the prior day alleging Jason was "caught smoking pot", despite Nate Yinger having stated in no uncertain terms that he did <u>not</u> see Jason or anyone else smoking pot.

80.     With every reason to know Jason Kuyper had not smoked marijuana that Sunday, February 14, 2016, or any other day, and that Jason possessed no marijuana, Headmaster Lehman announced to the entire school at a well-attended lunch on Tuesday, February 16, 2016, that Jason Kuyper had been "smoking and possessing marijuana in the dormitory".

81.     Headmaster Lehman's announcement on February 16, 2016, as the premier authority figure of The Hill School, to nearly the entire student body and faculty gave rise to the repeating and publishing of those false statements in various media, including The Hill School

News (on February 26, 2016), a publication made available to the entire school community, including its alumni, as well as the community of the Borough of Pottstown, PA.

82.     In emails to Jason Kuyper's father, copying David Allain, on Wednesday and Thursday (February 17 and 18, 2016), Headmaster Lehman falsely iterated that Jason had been "caught smoking marijuana" and that Jason had confided in him that he had used marijuana previously. Based on what can only be presumed to be his personal, familial experience, Headmaster Lehman had the temerity to even suggest Jason may have a drug addiction.

83.     Nate Yinger admitted under oath in a deposition to <u>not</u> having seen Jason smoke marijuana, Jason's <u>negative</u> drug test confirmed that he had not smoked marijuana and could not be a marijuana user let alone an addict, and Jason being the subject of interrogation behind a closed door by an intimidating authority figure of large stature after already having been dismissed from the school hardly constitutes confiding.

84.     Nonetheless, in open court on March 2, 2016, well after having received Jason Kuyper's negative drug test, Headmaster Lehman testified under oath that Jason possessed and used marijuana and admitted to having done so in his dormitory room, despite no such admission and knowing full well that Jason's drug test confirmed the impossibility of his having smoked marijuana.

85.     On information and belief, on February 29, 2016, Jennifer Bethke, the Associate Director of College Advising, sent communications to all the prep schools and colleges to which Jason Kuyper was applying, falsely alleging that Jason had committed <u>a major drug violation</u> and was consequently dismissed from The Hill School, thereby thwarting Jason's future plans of a PG (post-graduate) year to develop his soccer skills and seek recruitment to a higher echelon college.

86.     The Kuypers are not certain of the exact content of the letters sent to the schools to which Jason Kuyper applied, as those communications join the documents denied to Jason Kuyper for nearly a year and a half. They have only been privy to the two alternative letters The Hill School presented to them to extract the signing of a General Release by the Kuypers.

87.     The version of the letter The Hill School would send to the schools were the Kuypers to not acquiesce to The Hill School's extortive effort, read "On February 14, 2016, The Hill School immediately dismissed Jason for a major violation of our drug policy that occurred in the dormitory."

88.     The version of the letter The Hill School would send to the schools were the Kuypers to acquiesce to The Hill School's extortive effort, read "On February 14, 2016, Jason Kuyper was required to withdraw from The Hill School for an in-dormitory violation of Hill's drug and alcohol policy… All of us view this as a lapse of judgment, quite uncharacteristic of Jason's four years of strong performance and behavior."

89.     Both versions disregard a critical fact known to The Hill School at the time; that Jason Kuyper's drug test was negative (evidence of which they intentionally destroyed), and that Jason Kuyper committed <u>no</u> violation, in-dormitory or elsewhere, let alone a "major violation."

## Count 1

## Defamation/Defamation Per Se

## (By Jason Kuyper against All Defendants)

90.     Plaintiffs hereby incorporate by reference the prior paragraphs of this Complaint as though fully set forth at length.

91.     At all times relevant hereto, Jason Kuyper enjoyed the respect, confidence and esteem of his peers, teachers, coaches, colleges and prep schools to which he was applying, and others in the community. He had never been accused nor adjudged guilty of any crime, offense or violation of law which would tend to lessen the respect, confidence and esteem which he enjoyed and to which he was entitled.

92.     Defendants' statements identified in the foregoing paragraphs of this Complaint expressly or otherwise clearly referred to Jason Kuyper. They are false, and Defendants knew or should have known they were false at the time they made the statements.

93.     Defendants' statements are per se defamatory because they falsely assert that Jason Kuyper committed a crime and a major school violation.

16

94.     Defendants uttered and published their false statements and caused others to repeat them, with malicious intent to disseminate these falsehoods knowing that they would harm Jason Kuyper and deprive him of his good name, credit and reputation, and for the express purpose of causing that harm to Jason Kuyper.

95.     By reason of Defendants' uttering and publishing of their false statements, Jason Kuyper has been brought into scandal and reproach, and has been held to scorn and contempt among his peers and other in his community, is suspected by them to have been guilty of the offenses alleged in their false statements, and has suffered in his reputation, feelings and peace of mind.

## Count 2

## Breach of Contract

## (By all Plaintiffs against The Hill School)

96.     Plaintiffs hereby incorporate by reference the prior paragraphs of this Complaint as though fully set forth at length.

97.     Jason Kuyper's parents executed contracts with The Hill School for which Jason Kuyper is a third part beneficiary, for each of the four years that Jason Kuyper had been enrolled at and advanced at The Hill School. A copy of the reenrollment contract for Jason Kuyper's final school year, executed by Kuyper on March 6, 2015, is attached as Exhibit C.

98.     The 1-page contract of adhesion references "certain rules and regulations, and that a student is subject to them as they may be revised from time to time." The "certain rules and regulations" that "may be revised from time to time" can only refer to The Hill School Handbook, and can be understood to provide for rights to and impose obligations upon all parties to the contract, despite the handbook for any given academic year not being completed until several months after the deadline for the executed contract and nonrefundable deposit to be received by The Hill School.

## Breach of In Loco Parentis Obligation

99.     Page 1 of the 2015-16 handbook sets forth the "Core Tenets" of The Hill School, which first state: "The Hill School is an exceptionally close learning community, a place where faculty and students treat each other as family." The Hill School's *in loco parentis* duty extends beyond its obligations under the law, but allegedly in its self-imposed role as family, to fulfill its claim to be "The Family Boarding School."

100.    The actions described above, including but not limited to those relating to the ill-treatment and harassment by the Health Center as a consequence of Jason Kuyper's health condition, his placement as a 15-year-old to reside with and be bullied and hazed by 18 and 19-year-old seniors and PGs, to be denied proper parental supervision by being placed with a barely present, bachelor dorm "parent" in his mid-20s, exposing Jason Kuyper and the entire student body to a student purportedly dismissed from Headmaster Lehman's alma mater prep school for sexual misconduct, the seeming failure to investigate Jason Kuyper's sexual assault and subsequent bullying victimization, disregard for Jason Kuyper's emotional and physical well-being subsequent to the traumas suffered, and placing Jason Kuyper and other students under the care of a dorm "parent" ill-prepared for the role and unfamiliar with school rules and regulations, were a breach of The Hill School's *in loco parentis* duties and obligations under the contract.

## Failure to Abide by The Hill School Handbook's Sexual Harassment Terms

101.    Pages 43-44 of the 2015-16 handbook sets forth The Hill School's Sexual Harassment Policy. They are attached as Exhibit A.

102.    Under Section c(1) of the Sexual Harassment Policy "Physical assault, including rape, or any coerced sexual relations" falls within the purview of Sexual Harassment.

103.    The sexual assault of Jason Kuyper was reported to the Assistant Headmaster for Student Life, Jennifer Lagor, as the Sexual Harassment policy requires.

104.    The policy specifies in section d(4) that "[t]he official receiving the complaint of harassment will lead an investigation of any such allegations of harassment" and in section d(5) that "[t]he complaining party … shall … be informed of the results of the investigation."

105.    In violation of the requirement to inform the complaining party, Jennifer Lagor never "informed [Jason Kuyper] of the results of the investigation." as is required. It is therefore unclear whether The Hill School also violated the policy by never carrying out the required investigation.

## Failure to Abide by The Hill School Handbook's "Bully and Hazing" and "Harassment" Terms

106.    Pages 43 of the handbook states "Bullying, verbal or physical intimidation, or hazing is unacceptable behavior in our community." It further indicates "[c]yber-bullying … will not be tolerated and will be dealt with severely." However, the handbook does not indicate whether forms of bullying not constituting cyber-bullying will be tolerated, nor how such conduct is handled, from investigation to resolution.

107.    Similarly, the handbook states that "[t]he school forbids physical, verbal, or psychological harassment of any kind directed against any individual or group of individuals" without specifying what actions The Hill School takes in response the harassment of a student.

108.    Despite the handbook's failure to actually fully address bullying, hazing and harassment, it is reasonable for the Kuypers to presume that Jason Kuyper having been the victim of such conduct by fellow students at The Hill School, as a consequence of his having been sexually assaulted by a female student, should have been investigated.

109.    The Kuypers are unaware of the outcome of any such investigation nor are certain a proper investigation was ever conducted since Jason Kuyper was summarily and wrongfully dismissed from The Hill School just weeks following the school being advised of the bullying, hazing and harassment suffered by Jason.

110.    As a result of these breach of the contract, Plaintiffs have suffered direct and consequential damages.

## Count 3

## Interference with Prospective Contractual Relations

## (By all Plaintiffs against Defendants The Hill School, Zachary Lehman and Jennifer Bethke)

111.    Plaintiffs hereby incorporate by reference the prior paragraphs of this Complaint as though fully set forth at length.

112.    Plaintiffs has prospective contractual relations between themselves and the prep schools and colleges to which Jason Kuyper was applying.

113.    Defendants The Hill School, Zachary Lehman and Jennifer Bethke purposefully, with specific intent to harm those existing prospective contractual relations, caused falsely accusatory letters and emails to be sent to the prep schools and colleges to which Jason Kuyper was applying, with the specific intent to harm and prevent the prep schools and colleges from accepting Jason and entering into contracts with the Kuypers.

114.    There was no privilege or justification on the part of Defendants The Hill School Zachary Lehman and Jennifer Bethke. There was no requirement or obligation to either the prep school nor the college association to report what Defendants The Hill School Zachary Lehman and Jennifer Bethke reported, neither when they reported nor in the manner they reported.

115.    Plaintiffs have suffered actual damages as a result if this conduct by Defendants The Hill School Zachary Lehman and Jennifer Bethke, being unable to be accepted by and attend desired prep school, and potentially by colleges, and being unable to be accepted by and attend higher choice and less expensive colleges.

## Count 4

## False Imprisonment

## (Against The Hill School and Zackary Lehman)

116.    Plaintiffs hereby incorporate by reference the prior paragraphs of this Complaint as though fully set forth at length.

117.    Jason was restrained by Headmaster Lehman during the interrogation that he conducted one-on-one in a closed room after Jason had been informed by the Dean of Students and Headmaster Lehman himself that Jason had been dismissed.

118.    That restraint was without adequate legal justification because Jason was no longer a student at The Hill School and was awaiting his mother to pick him up.

119.    The Hill School and Headmaster Lehman are therefore liable to Jason Kuyper for compensatory damages for Jason's false imprisonment.

120.    Headmaster Lehman's conduct in falsely imprisoning Jason is outrageous, because of Headmaster Lehman's evil motive and his reckless indifference to Jason's rights. Headmaster Lehman's acts were intentional, reckless and malicious. The Hill School and Headmaster Lehman are therefore liable to Jason Kuyper for punitive damages.

## Count 5

### Negligent Infliction of Emotional Distress

### (By Jason Kuyper Against All Defendants)

121.    Plaintiffs hereby incorporate by reference the prior paragraphs of this Complaint as though fully set forth at length.

122.    The Hill School and its faculty had both a contractual and a fiduciary duty toward Jason because he is a student and a third-party beneficiary of the reenrollment contract between the Kuypers and The Hill School. The preexisting relationship between Jason and The Hill School involved duties that obviously and objectively hold the potential for deep emotional harm in the event of breach. The relationship between student Jason and The Hill School faculty was one that encompassed an implied duty to care for Jason's emotional well-being.

123.    The discriminatory treatment of Jason Kuyper by Sandra Ryder as a consequence of his suffering from Type I Diabetes was a constant reminder to Jason if his health disease, and caused Jason to suffer emotional distress.

124.   Headmaster Lehman and The Hill School breached those duties when Headmaster Lehman unnecessarily and intimidatingly interrogated Jason in a closed room with no others present.

125.   Headmaster Lehman and The Hill School also breached those duties when they directly and through their attorney threatened Jason and his parents that The Hill School would actively inform the schools that Jason is applying to about his summary dismissal, even though The Hill School's policy is to only answer questions if asked.

126.   This threat having been carried out caused Jason to face irreparable harm from not being accepted at any of the prep schools to which he was applying. The Hill School and Headmaster Lehman improperly used erroneous facts, the accuracy of which was well known to him, and the information of Jason's transcript requests from the college advising office to inflict this emotional suffering.

127.   The more favorable treatment of the student who sexually harassed and assaulted Jason also negligently caused Jason to suffer further emotional distress.

128.   The wrongful dismissal of Jason Kuyper from the Hill School by Defendants Lehman and Allain caused Jason to suffer further emotional distress.

129.   The false public statements by Defendants Lehman, Allain, Yinger, Eccleston, and Ryder, of Jason Kuyper's marijuana use negligently caused Jason to suffer further emotional distress.

130.   The inaccurate reference by Defendants Zachary Lehman, Sandra Ryder, Nate Yinger to Jason Kuyper having tested positive for marijuana when he had not consumed marijuana and, consequently, had a negative drug test result, negligently caused Jason to suffer further emotional distress.

131.   Jason Kuyper is therefore entitled to compensatory damages awarded against Defendants for the negligent infliction of emotional distress upon Jason.

## Count 6

## Intentional Infliction of Emotional Distress

## (By Jason Kuyper Against The Hill School and Zachary Lehman)

132.    Plaintiffs hereby incorporate by reference the prior paragraphs of this Complaint as though fully set forth at length.

133.    Headmaster Lehman's conduct in interrogating Jason was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

134.    Headmaster Lehman specifically intended to inflict the emotional distress that Jason suffered.

135.    Headmaster Lehman's conduct in inflicting this emotional distress on Jason is outrageous, because of Headmaster Lehman's evil motive and his reckless indifference to Jason's rights. Headmaster Lehman's acts were and are intentional, reckless and malicious. The Hill School and Headmaster Lehman are therefore liable to Plaintiffs for punitive damages.

## Prayer for Relief

Plaintiffs pray for the following relief:

a.  Judgment in their favor on all counts against defendants;

b.  An injunction requiring correction of the false statements; and

c.  Compensatory damages in an amount in excess of $150,000.00, attorneys' fees, interest, costs, punitive damages, and such other additional relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues triable to a jury.

Respectfully submitted,

FLAMM WALTON HEIMBACH & LAMM, PC

Richard H. Maurer/RHM4782
794 Penllyn Pike, Suite 100
Blue Bell, PA 19422
215-419-1575
215-419-1560 fax

rhmaurer@flammlaw.com

Counsel for Plaintiffs

Dated:  July 21, 2017